## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

PRISON LEGAL NEWS, INC.,           )
                                   )
                    Plaintiff,     )      **CIVIL ACTION**
                                   )
v.                                 )      No.  02-4054-MLB
                                   )
CHARLES SIMMONS, et al.,           )
                                   )
                    Defendants.    )
_____)

KRIS ZIMMERMAN,                    )
                                   )
                    Plaintiff,     )      **CIVIL ACTION**
                                   )
v.                                 )      No.  00-3370-MLB
                                   )
CHARLES SIMMONS, et al.,           )
                                   )
                    Defendants.    )
_____)

JOSEPH E. JACKLOVICH, Sr.,         )
                                   )
                    Plaintiff,     )      **CIVIL ACTION**
                                   )
v.                                 )      No.  01-3017-MLB
                                   )
CHARLES SIMMONS, et al.,           )
                                   )
                    Defendants.    )
_____)

## MEMORANDUM AND ORDER

These cases come before the court on defendants' motion to dismiss claims against them in their individual capacities based on qualified immunity. (No. 02-4054-MLB, Doc. 67.)[1] In the alternative, defendants ask that the motion be construed as one seeking partial summary judgment based on qualified immunity. Id. at 2. Defendants

_____

[1] From this point forward, all citations to the record will reference Case No. 02-4054-MLB, unless expressly noted.

attached a brief to their motion and plaintiffs filed a response. (Docs. 67 attach. 1; 69.)   No reply has been filed.   Defendants' motion is GRANTED for reasons set forth herein.

## I.   BACKGROUND AND PROCEDURAL HISTORY

Proceeding under 42 U.S.C. § 1983, plaintiffs challenge the constitutionality of certain Kansas Administrative Regulations and Kansas Department of Corrections policies that 1) prohibit inmates in state prisons from receiving publications ordered for them by third parties; 2) limit the amount of money inmates can spend monthly on newspapers, publications, and the like; and, 3) completely prohibit certain categories of inmates from purchasing books, newspapers, and publications. (Doc. 74, Second Amended Pretrial Order (2d PTO) at 8-9 ¶ 5a.)   Plaintiffs Zimmerman and Jacklovich were inmates incarcerated in Kansas prisons.   They claim that enforcement of these policies and regulations violated their First Amendment right to receive publications in prison.   Jacklovich also asserts that certain defendants conspired to violate his constitutional rights.   Plaintiff Prison Legal News, Inc. (PLN), is a non-profit organization based in Washington-state that publishes Prison Legal News, a periodical that discusses legal issues of interest prisoners.   Plaintiffs seek declaratory and injunctive relief, as well as money damages.   Id. at 3, 8-9, 14-15.)

The cases were originally assigned to Senior District Judge Van Bebber.[2]   Although the individual cases were filed at different times,

---

[2] No. 02-4054 was first assigned to Judge Robinson.   However, based presumably on its similarity to the other two cases, No. 02-4054 was promptly transferred to Judge Van Bebber.   (Doc. 5.)

plaintiffs ultimately came to be represented by the same counsel and have, for all practical purposes, presented their cases jointly since that time.   In fact, plaintiffs moved to have their cases consolidated. (Doc. 11.)  Judge Van Bebber denied that motion, but ordered that discovery conducted in any of the cases could be used in the other cases. (Doc. 18.)

On January 21, 2003, plaintiffs filed a motion for summary judgment. (Doc. 29.)  That same day, defendants filed a motion for judgment on the pleadings or, in the alternative, for summary judgment. (Doc. 30.)  Judge Van Bebber denied plaintiffs' motion and granted summary judgment to defendants. Zimmerman v. Simmons, 260 F. Supp. 2d 1077 (D. Kan., 2003).  Plaintiffs appealed, and the Tenth Circuit reversed based on its conclusion that factual issues precluded summary judgment.  Jacklovich v. Simmons, 392 F.3d 420 (10th Cir. 2004).  Following remand, the case was reassigned here after the sad and unexpected death of Judge Van Bebber.

At some point during the course of this litigation, Zimmerman and Jacklovich were paroled.  The court directed the parties' attention to Booth v Barton, 157 F. Supp. 2d 1178, 1182 (D. Kan. 2001) and its summary of the Tenth Circuit case law holding that prisoners' claims for declaratory or injunctive relief are generally rendered moot when the prisoner is paroled or otherwise released from incarceration. (Doc. 70.)  Following review of that law, Zimmerman and Jacklovich conceded that their claims for declaratory and injunctive relief were moot, leaving only their claims for damages.  2d PTO at 15 ¶ 11.

Defendants now assert that they are entitled to qualified immunity. (Doc. 67 attach. 1 at 2.)  Thus, they ask the court to

-3-

dismiss the cases against them in their individual capacities pursuant to Federal Rule of Civil Procedure 12, or to grant them summary judgment under Rule 56.

## II.  FACTS

The Tenth Circuit provided a lengthy account of the relevant facts in its opinion.  Since the parties have provided no new evidence following remand, the court relies on the circuit's factual summary:

> Kansas Administrative Regulation § 44-12-601(g)(1) provides that "[a]ll books, newspapers, and periodicals shall be purchased through special purchase orders."  This regulation essentially requires that all publications be purchased by inmates through their facility bank accounts, thus prohibiting the receipt of all gift publications.  Inmates are allowed only a facility bank account; all of an inmate's funds must be deposited therein and transactions involving any other financial account are only permitted by written permission.  Any person can mail a money order, certified check or cashier's check to an inmate account.
>
> The regulation barring subscriptions to publications had an effective date of April 17, 1998, but it was not enforced initially; a May 3, 1999, memo gave notice that the policy would be enforced on June 23, 2000, allowing a one-year grandfathering period for inmates to receive newspaper and magazine subscriptions not purchased through a facility bank account. Another one-year grandfathering period was allowed for Level II and III inmates until March 2, 2002, for one gift publication of the inmate's choice and for only one year, regardless of the amount of time remaining on the subscription.
>
> In addition to the ban on publications not purchased through facility bank accounts, KDOC Internal Management Policy and Procedure ("IMPP") 11-101 limits the amount of an inmate's outgoing funds to $30.00 per month.[3]  Inmates assigned to

---

[3] This limit has now been raised to $40 per month.  Plaintiffs still contend that the limit violates their First Amendment rights. This change in the law and plaintiffs' revised position were incorporated into the case in the first amended pretrial order. (Doc. 66.)

Intake Level and Level I may not use outgoing funds to purchase books, or newspaper or magazine subscriptions. [FN3]   Although inmates at Level I may have a hot pot, fan, alarm clock, blow dryer, extension cord, curling iron, lamp, ice chest and all consumable post-intake property, they may not have books, magazines or newspapers. Inmates assigned to Level II and III may purchase books, or newspaper or magazine subscriptions subject to the $30.00 limit.   That limit may be exceeded once every three months for the purchase of one newspaper subscription.

FN3. IMPP 11-101 (01-07-02) provides in pertinent part:

VI. Limitation on Use of Incoming and Outgoing Funds

A. For inmates assigned to Intake Level, outgoing funds shall be limited to fees for legal services, and for inmates on Level I, no outgoing funds may be used to purchase books, or, newspaper or magazine subscriptions.

B. Except as provided below, there shall be a $30.00 limit on outgoing funds.

1. Inmates may exceed the $30.00 limit, if necessary, for the purchase of a primary religious text if the cost of the text is greater than that amount.

2. The $30.00 limit shall not apply to payments to the following:

a. The court for verified restitution and/or court costs;

b. Verified fees payable to an attorney for legal services;

c. Verified child support payments;

d. Specialized fees, expenses as authorized by the warden or designee; and,

(1) As possible, approval for such payments shall be payable to the vendor or service provider only.

e. Purchases of approved handicraft materials/supplies.

-5-

C. Upon recommendation of the unit team and approval of the warden or designee, offenders assigned to private industry (minimum wage) or those who receive government benefits may be authorized, on an individual basis, to send out funds in excess of the $30.00 per pay period limit.

D. Inmates on Incentive Level II or Incentive Level III are authorized to maintain one (1) newspaper subscription, and may exceed the $30.00 limit for outgoing funds in order to do so.

1. The expense for the newspaper subscription shall be included in the $30.00 limit.

2. Such an exception shall be allowed no more than one (1) time per every three (3)-month period.

Former Kan. Admin. Regs. § 44-12-601(l) (Feb. 15, 2002) provided that "[e]xcept for material ordered through approved special purchase orders, incoming bulk-rate mail shall not be delivered." The current regulation is more specific: "Incoming mail addressed solely to a specific inmate and not otherwise subject to censorship shall be delivered regardless of whether the mail is sent free of charge or at a reduced rate." Kan. Admin. Regs. § 44- 12-601(b)(7) (July 2, 2004). In answers to interrogatories, the Defendants stated that inmates may receive free publications, provided that the publications are truly free and do not require the inmate to take affirmative action to cancel a trial subscription. As we understand it, "gift subscriptions" are subscriptions that are paid for by anyone other than the vendor. To be "truly free," it must not be possible for an inmate to pay for it. Kan. Admin. Regs. § 44-12-209 provides that an inmate may not enter into a contract or incur a financial obligation absent approval.

According to regulation, publications received not in conformity with these policies are censored. Kan. Admin. Regs. § 44-12-601(g)(2) & former Kan. Admin. Regs. § 44-12-601(q)(2) (Feb. 15, 2002). Inmates are notified in writing and given the reason for the censorship, and are given the name and address of the sender if known; it is up to the inmate to contact the sender if he so desires. Kan. Admin.

-6-

Regs. § 44-12-601(d)(2). The author (sender) of
the censored item is given a reasonable
opportunity to protest the censorship decision to
a different prison official. Kan. Admin. Regs.
§ 44-12-601(d)(2)(C) & (D).

While acknowledging the mail review process
contained in the regulation, an affidavit from
Defendant Bruce, the Warden of the Hutchinson
Correctional Facility, suggests a different
procedure. Seizures of materials sent to
Plaintiff Zimmerman were treated "as a property
issue alone with the inmate's option within 10
days of notification being whether to send out
the material to a designated address or that it
be destroyed." According to the Warden, the
procedure in the censorship regulation was not
followed because the seizure was not
content-based and, if the regulation was
followed, the material would have to be held for
45 days during the appeals process, rather than
10 days, causing serious storage and fire
concerns.

Plaintiff[s] [Jacklovich and Zimmerman]
proceed under 42 U.S.C. § 1983, alleging that
Defendant corrections officials have deprived
them of their First Amendment rights by refusing
to deliver to them numerous publications
(including more than one newspaper and several
magazines) not purchased with a special purchase
order, including gift subscriptions. Included
among those publications is Prison Legal News,
paid for by friends and family outside of the
prison. Plaintiffs claim their rights are
further infringed by the limits on the amount of
money that may be spent each month on
publications, as well as by the limit of one
newspaper subscription.

Plaintiff Prison Legal News, Inc. is a
non-profit publisher of Prison Legal News, a
monthly magazine that focuses on prison issues.
Although friends and family of KDOC inmates have
paid for subscriptions to Prison Legal News for
certain inmates, corrections officials have
refused to deliver the publications. In
addition, corrections officials do not notify PLN
when a publication is not delivered. PLN
contends that the refusal to allow inmates to
receive publications unless purchased from a
facility bank account, the $30.00 limit, the
limit on the number of subscriptions, and the
complete ban on publications for Level I inmates
violates its First Amendment right to communicate
with inmates. PLN also complains that the prison

-7-

> policies deprive it of due process because it is
> never notified of non-delivery, given a reason
> for the non-delivery, and/or given an opportunity
> to contest it.
>      Defendants advance two rationales for the
> policies--security and behavior management.
> First, they contend that the ban on gift
> publications allows the facility to monitor and
> regulate all inmate financial transactions, and
> control the property entering the facility. This
> monitoring allows them to be better able to
> detect financial transactions that violate prison
> rules and regulations or state law, such as
> theft, drug dealing, debt adjustment, as well as
> entering into contracts without authorization and
> obtaining property by false pretenses.    In
> particular, Defendants seek to prevent the
> practice of strong-arming, where one inmate
> coerces another to arrange for a gift
> subscription to be purchased by someone on the
> outside.   Second, Defendants submit that the
> policies provide incentives for good behavior and
> better citizenship by inmates, including paying
> restitution, child support, court filing fees and
> other outstanding financial obligations.

Jacklovich, 392 F.3d 420 (10th Cir. 2004) (citations to the record and some footnotes omitted).

## III.   SUMMARY JUDGMENT STANDARD: FRCP 56

Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  In determining whether a genuine issue of material fact exists, the court "view[s] the evidence in a light most favorable to the non-moving party." Qwest Corp. v. City

-8-

of Santa Fe, N.M., 380 F.3d 1258, 1265 (10th Cir. 2004) (quotation
omitted).   When confronted with a fully briefed motion for summary
judgment, the court must ultimately determine "whether there is the
need for a trial—whether, in other words, there are any genuine
factual issues that properly can be resolved only by a finder of fact
because they may reasonably be resolved in favor of either party."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If so, the
court cannot grant summary judgment.    Prenalta Corp. v. Colo.
Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991).

## IV.   ANALYSIS

Defendants claim that they are entitled to qualified immunity for
all the claims brought against them in their individual capacities.[4]
(Doc. 67 at 2; attach. 1 at 2, 10 & n.2).   Qualified immunity is the
right not to stand trial for a given offense, and operates as a shield
against a claim for money damages.   Maestas v. Lujan, 351 F.3d 1001,
1008 (10th Cir. 2003).   The Supreme Court described the rationale
behind the doctrine of qualified immunity as follows:

> When government officials abuse their offices,
> "action[s] for damages may offer the only
> realistic avenue for vindication of
> constitutional guarantees."   Harlow v.
> Fitzgerald, 457 U.S., at 814, 102 S. Ct., at
> 2736.   On the other hand, permitting damages
> suits against government officials can entail
> substantial social costs, including the risk that
> fear of personal monetary liability and harassing
> litigation will unduly inhibit officials in the
> discharge of their duties.   Ibid.  Our cases have
> accommodated these conflicting concerns by

---

[4] Defendants Simmons and Werholtz also contend that they are
entitled to absolute immunity for their roles in enacting the rules
and policies at issue in this case. (Doc. 67 attach. 1 at 8.)  Since
the court finds that all defendants are entitled to qualified
immunity, it need not reach this question.

> generally providing government officials
> performing discretionary functions with a
> qualified immunity, shielding them from civil
> damages liability <u>as long as their actions could
> reasonably have been thought consistent with the
> rights they are alleged to have violated.</u>

<u>Anderson v. Creighton</u>, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038 (1987)
(emphasis added).  As a practical matter, qualified immunity protects
"all but the plainly incompetent or those who knowingly violate the
law."  <u>Malley v. Briggs</u>, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096
(1986).

Once a defendant asserts qualified immunity, "the burden shifts
to the plaintiff [to] satisf[y] a heavy two-part burden."  <u>Neal v.
Lewis</u>, 414 F.3d 1244, 1247 (10th Cir. 2005) (alterations in original)
(quotation omitted).  First, plaintiffs must identify a constitutional
or statutory right and allege facts showing a violation of that right.
<u>Id.</u>  Then, plaintiffs must show that the right was clearly established
at the time of the alleged violation.  <u>Id.</u> at 1248.  If plaintiffs
make this showing, defendants may still be entitled to qualified
immunity if they can show that their actions were nonetheless
reasonable in light of the clearly established law.  <u>Roska ex rel.
Roska v. Peterson</u>, 328 F.3d 1230, 1251 (10th Cir. 2003).  The court
may not address the steps out of order because the analysis must be
sequential.  <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S. Ct. 2151,
2156, 150 L. Ed. 2d 272 (2001).

As an initial matter, plaintiffs half-heartedly argue that it is
improper for the defendants to assert qualified immunity at this point
in the proceedings.  (Doc. 69 at 7-8.)  Plaintiffs suggest that, since
the court of appeals remanded the case for trial, that court must have

-10-

somehow implicitly found no basis for qualified immunity. Id. On the contrary, the issue of qualified immunity has never been raised in these proceedings, either in the district court or to the circuit court. Plaintiffs imply that had there been any merit to a defense of qualified immunity, the court of appeals would have raised it sua sponte. That argument is without merit, as evinced by plaintiffs' failure to cite any authority for their proposition.

Even reading plaintiffs' objection broadly as asserting that defendants have waived their right to raise a defense of qualified immunity at this point, the argument is simply incorrect. "A defendant who has appropriately pleaded the affirmative defense of qualified immunity may establish his right to immunity at any point in the proceeding, including at trial." Guffey v. Wyatt, 18 F.3d 869, 873 (10th Cir. 1994) (quoting Figueroa-Rodriguez v. Aquino, 863 F.2d 1037, 1041 n.5 (1st Cir. 1988)); see also Maestas, 351 F.3d at 1010 (same). Moreover, even the cases that have found a waiver have done so based on a defendant's dilatory conduct in asserting the defense. See Guzman-Rivera v. Rivera-Cruz, 98 F.3d 664, 667-68 (1st Cir. 1996); English v. Dyke, 23 F.3d 1086, 1090 (6th Cir. 1994); Apostol v. Gallion, 870 F.2d 1335, 1338-39 (7th Cir. 1989). Here, defendants initially filed a motion for summary judgment on the merits of the case, which was granted. Following reversal of that judgment by the court of appeals, defendants promptly asserted their defense of qualified immunity. This defense has been consistently preserved in the pleadings and the pretrial orders. Accordingly, the court finds defendants' assertion of qualified immunity is timely.

Proceeding to the first step in the analysis, plaintiffs rely on

-11-

the Tenth Circuit's formulation of the right at issue: "Inmates have a First Amendment right to receive information while in prison <u>to the</u> <u>extent the right is not inconsistent with prisoner status or the</u> <u>legitimate penological objectives of the prison</u>." <u>Jacklovich</u>, 392 F.3d at 426 (citing <u>Pell v. Procunier</u>, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)) (emphasis added).[5] (Doc. 69 at 8.) The underlined language limits the scope of plaintiffs' right, and the effect of that qualifying language is explained as follows:

> The Court has determined that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." <u>Turner [v. Safley]</u>, 482 U.S. at 89, 107 S. Ct. 2254.  The four-factor test supplied by the Court requires a look at (1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest, (2) whether alternative means of exercising the constitutional right remain available to inmates, (3) any effect accommodating the right would have on guards and inmates, and (4) the absence of ready alternatives. <u>Id.</u> at 89-90, 107 S. Ct. 2254.

<u>Jacklovich</u>, 392 F.3d at 426.  Although the formulation of the right at this stage is rather broad, with a great deal of factual inquiry necessary to determine whether the right was actually violated, it is nonetheless sufficient to satisfy plaintiffs' burden.  When the violation of a right is to be determined by applying a test "which must accommodate limitless factual circumstances," as does the <u>Turner</u> test, the statement of the right at issue may be very general in its terms.  <u>Saucier</u>, 533 U.S. at 205, 207-08, 121 S. Ct. at 2158, 2159

_____

[5] In their brief, plaintiffs misstate this rule by omitting the underlined language, which qualifies the right.  (Doc. 69 at 8.)

(recognizing that the general Fourth Amendment prohibition against using excessive force was a sufficient statement of the constitutional right at issue because the relevant test from Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) was fact-intensive).

By contrast, when determining whether the right was clearly established at the time of the alleged violation, the analysis becomes more focused on the specific conduct alleged to have violated plaintiffs' rights. Id. at 201, 121 S. Ct. at 2156. To satisfy their burden, plaintiffs "need not present an identical case to show the law was clearly established; instead, a plaintiff must show only that the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Sutton v. Utah State Sch. for Deaf and Blind, 173 F.3d 1226, 1241 (10th Cir. 1999) (alterations in original) (citations and internal quotation marks omitted). The Tenth Circuit "require[s] 'some but not precise factual correspondence' between the cases cited and the factual situation in the case at hand." Horstkoetter v. Dep't of Pub. Safety, 159 F.3d 1265, 1278 (10th Cir. 1998) (quoting Lawmaster v. Ward, 125 F.3d 1341, 1351 (10th Cir. 1997)).

Beyond that, the question of whether a right is clearly established in the Tenth Circuit in an interesting one. All the Tenth Circuit cases to address this question in the last decade agree that the law is clearly established when there is a Supreme Court or Tenth Circuit case on point. See, e.g., McFall v. Bednar, 407 F.3d 1081, 1087 (10th Cir. 2005); Finn v. New Mexico, 249 F.3d 1241, 1250 (10th Cir. 2001); Anaya v. Crossroads Managed Care Sys., Inc., 195 F.3d 584,

-13-

594 (10th Cir. 1999); <u>Mick v. Brewer</u>, 76 F.3d 1127, 1134 (10th Cir. 1996); <u>Woodward v. City of Worland</u>, 977 F.2d 1392, 1397 (10th Cir. 1992).  By contrast, there has been a change in the language used to describe the standard to be applied when neither a Supreme Court case nor a Tenth Circuit case addresses the matter.  The original standard was first articulated in <u>Medina v. City and County of Denver</u>, 960 F.2d 1493 (10th Cir. 1992), where the court said,

> Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, <u>or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains</u>.

<u>Id.</u> at 1498 (emphasis added).[6]  In the years following <u>Medina</u>, this statement was frequently quoted as the proper standard to apply when determining whether a right was clearly established.   <u>See, e.g.,</u> <u>Greene v. Barrett</u>, 174 F.3d 1136, 1142 (10th Cir. 1999); <u>Mick</u>, 76 F.3d at 1134; <u>Albright v. Rodriguez</u>, 51 F.3d 1531, 1535 (10th Cir. 1995); <u>Woodward</u>, 977 F.2d at 1397.

Then, in <u>Murrell v. School District No. 1, Denver, Colo.</u>, 186 F.3d 1238 (10th Cir. 1999), the circuit purported to quote the operative language from <u>Medina</u>; however, there was an apparent misquote, and the language in the standard was changed to read,

---

[6] <u>Medina</u> cited <u>Stewart v. Donges</u>, 915 F.2d 572, 582-83 & n.14 (10th Cir. 1990) for this proposition.  In turn, <u>Stewart</u> cited <u>Morfin v. Albuquerque Pub. Sch.</u>, 906 F.2d 1434, 1439 (10th Cir. 1990), for the following language: "In the absence of contemporary Tenth Circuit precedent directly concerning the issue, we may look to the law of other circuits when deciding whether or not a right was clearly established." <u>Stewart</u>, 915 F.2d at 583 n.12.  Thus, although the idea expressed in <u>Medina</u> is derived from earlier cases, <u>Medina</u> set forth the language that became the standard for this inquiry in subsequent cases.

-14-

> In order for the law to be clearly established,
> "there must be a Supreme Court or other Tenth
> Circuit decision on point, or the clearly
> established weight of authority from <u>other</u>
> <u>circuits</u> must have found the law to be as the
> plaintiff maintains." <u>Medina v. City and County</u>
> <u>of Denver</u>, 960 F.2d 1493, 1498 (10th Cir. 1992).

<u>Id.</u> at 1251 (emphasis added). Read literally, the emphasized language
shrinks the scope of the "clearly established" inquiry from looking
at the weight of authority from "other courts" to looking only at the
weight of authority from "other circuits."

Since <u>Murrell</u> was issued, subsequent opinions from the Tenth
Circuit have been inconsistent in the language used.  Some opinions
use the language from <u>Murrell</u>.  <u>See, e.g.,</u> <u>Peterson v. Jensen</u>, 371
F.3d 1199, 1202 (10th Cir. 2004); <u>Finn</u>, 249 F.3d at 1250; <u>Lybrook v.</u>
<u>Members of Farmington Mun. Sch. Bd. of Educ.</u>, 232 F.3d 1334, 1338
(10th Cir. 2000); <u>Johnson v. Martin</u>, 195 F.3d 1208, 1216 (10th Cir.
1999).  Conversely, other Tenth Circuit opinions have continued to use
the language from <u>Medina</u>.  <u>See, e.g.,</u> <u>Mimics, Inc. v. Village of Angel</u>
<u>Fire</u>, 394 F.3d 836, 842 (10th Cir. 2005); <u>Gonzales v. City of Castle</u>
<u>Rock</u>, 366 F.3d 1093, 1117 (10th Cir. 2004), <u>rev'd on other grounds</u>,
__ U.S. __, 125 S.Ct. 2796 (2005); <u>DeSpain v. Uphoff</u>, 264 F.3d 965,
979 (10th Cir. 2001); <u>Currier v. Doran</u>, 242 F.3d 905, 925 (10th Cir.
2001); <u>Cruz v. City of Laramie, Wyo.</u>, 239 F.3d 1183, 1189 (10th Cir.
2001); <u>Anaya</u>, 195 F.3d at 594.

Analysis of the post-<u>Murrell</u> cases that used the <u>Medina</u> "other
courts" language shows that they not only quoted the broader language,
but applied it as well.  For example, in <u>Despain v. Uphoff</u>, which was
decided almost two years after <u>Murrell</u>, the circuit looked not only
to the law of other circuits, but also to a case from the Supreme

-15-

Judicial Court of Massachusetts, in order to determine that certain rights were clearly established. <u>Despain</u>, 264 F.3d at 974-75. Similarly, in <u>Cruz v. City of Laramie, Wyoming</u>, the Tenth Circuit looked to cases from other circuits, as well as cases from federal district courts to decide whether the plaintiff's rights were clearly established. <u>Cruz</u>, 239 F.3d at 1188-90.[7]

Taken collectively, the court concludes that the Tenth Circuit never intended <u>Murrell</u> to change the standard for determining when a right is clearly established in the absence of controlling Supreme Court or Tenth Circuit authority. Given that <u>Murrell</u> purported to quote <u>Medina</u>, but inserted an error into the quote, along with the fact that <u>Murrell</u> never discussed changing the <u>Medina</u> standard, the court finds that the misquote was merely a scrivener's error. This conclusion is bolstered by the fact that subsequent cases from our circuit occasionally look beyond other circuit courts when evaluating whether a right was clearly established.

That conclusion notwithstanding, the fact that this error has not been discussed in a reported case from the Tenth Circuit suggests that the error may not be very significant. In other words, although the circuit may be willing to consider cases from courts beyond the federal appellate courts, the focus should normally be on cases

---

[7] For a good example of a pre-<u>Murrell</u> case showing just how far the Tenth Circuit is willing to go to determine whether a right is clearly established, <u>see</u> <u>V-1 Oil Co. v. Means</u>, 94 F.3d 1420, 1425-26 (10th Cir. 1996), where the court looked to the Third Circuit, the District of Kansas, the supreme courts of Kansas and Iowa, the intermediate appellate courts of Kansas, New Mexico, Washington, and Ohio, and even the state trial courts of New York. Finding a fairly balanced split of authority on the matter, <u>V-1 Oil</u> concluded that the right at issue was not clearly established.

decided by other circuits.  Thus, a district court may consider any source of judicial precedent, state or federal, when making the clearly established inquiry in the absence of controlling authority; however, as a practical matter, it will require far fewer circuit court cases to make a right clearly established than it will district court or even state court cases.

Moreover, this approach is only sensible in light of the controlling inquiry in all qualified immunity cases - "whether it would be clear to a reasonable officer [in the defendant's position] that his conduct was unlawful in the situation he confronted." Simkins v. Bruce, 406 F.3d 1239, 1241 (10th Cir. 2005) (quoting Saucier, 533 U.S. at 202).  The court finds that it is not reasonable to expect police officers and prison guards to stay abreast of the latest opinions out of federal district courts and state courts outside of their own jurisdiction.  While a growing multitude of rulings from these lower courts might ultimately suffice to clearly establish a right not passed upon by the circuit courts, this would be a rarity.  Even one or two cases from other circuits should not normally be sufficient to make a right "clearly established" for qualified immunity purposes unless the right is so patently obvious that the only reason it has not been recognized by more federal appellate courts is because it has never been litigated.

This view of what it takes to make a constitutional right clearly established is supported by numerous Tenth Circuit cases.  In Gonzales v. City of Castle Rock, the Tenth Circuit recognized a property right to enforcement of a restraining order.  Gonzales, 366 F.3d at 1117. In determining whether that right was clearly established, the court

-17-

identified two cases from other circuits that were notably similar, as well as two district court cases that were even more on point. Id. at 1118. Nonetheless, the circuit concluded that this was simply not enough to make the right clearly established. Id. Although the Supreme Court ultimately reversed on the ground that there was no property right to the enforcement of a restraining order, Town of Castle Rock, Colo. v. Gonzales, 125 S.Ct. at 2810, this ruling has no bearing on the methodology used by the Tenth Circuit in determining whether the right it erroneously recognized was clearly established.

Similarly, in Wilson v. Meeks, 52 F.3d 1547 (10th Cir. 1995), similar cases from the First, Fifth, and Seventh Circuits did not suffice to make a right clearly established. Id. at 1557. In Albright v. Rodriguez, a single on-point case from the Ninth Circuit failed to make a right clearly established. 51 F.3d at 1538. Woodward v. City of Worland held that a single Seventh Circuit case combined with five cases from the federal district courts was simply not enough to clearly establish a constitutional right. 977 F.2d 1397. In fact, Woodward stated that "[n]ormally, a single recent case from one circuit is not sufficient to make the law clearly established in another circuit. Also, a district court decision will not ordinarily clearly establish the law even of its own circuit, much less that of other circuits." Id. (quoting Martin A. Schwartz & John E. Kirklin, Section 1983 Litigation: Claims, Defenses, and Fees § 9.20, at 537 (2d ed. 1991)) (internal quotation marks omitted). Finally, Medina concluded that a right was not clearly established by a Seventh Circuit case and one district court case. Medina, 960 F.2d at 1498 & n.6. Moreover, Medina taught that "allegations of

-18-

constitutional violations that require courts to balance competing interests may make it more difficult to find the law 'clearly established' when assessing claims of qualified immunity." <u>Id.</u> at 1498. This guidance is particularly relevant here, where the court must balance the First Amendment rights of prisoners with the penological interests of the facilities in which they are duly incarcerated.

In contrast with these cases are those where the Tenth Circuit <u>has</u> found that a right was clearly established. In <u>Despain v. Uphoff</u>, the Tenth Circuit looked to decisions from the Second, Fifth, Seventh, and Eighth Circuits, the Supreme Judicial Court of Massachusetts, and a similar Tenth Circuit case before concluding that the right at issue in that case was clearly established. 264 F.3d at 974-75, 979. Similarly, in <u>Currier v. Doran</u>, our circuit found a right clearly established based on similar cases from the Second, Third, Seventh, Eighth, and Ninth Circuits, along with some extrapolation of existing Tenth Circuit law. 242 F.3d at 923-24. In <u>Anaya v. Crossroads Managed Care Systems, Inc.</u>, the Tenth Circuit found a right clearly established based on factually similar holdings from the Second, Fourth, Seventh, Eighth, Ninth, and District of Columbia Circuits. 195 F.3d at 594-95; <u>see also Lawmaster</u>, 125 F.3d at 1351 (right clearly established based on five cases from four other circuits)

While there is no bright line of demarcation, a synthesis of these cases shows that ordinarily a court would expect to see cases from at least three other circuits before concluding that a right is clearly established based on the "clearly established weight of authority from other courts." <u>Medina</u>, 960 F.2d at 1498. Of course,

no hard and fast rule of this nature would be appropriate.  However, in order for the law to be clearly established by a lesser showing, the right at issue ought to be fairly obvious.

Turning to the matters presented in this case, plaintiffs allege that defendants violated their right to receive information in three ways: by a blanket prohibition on gift subscriptions; by imposing a $40 monthly limit on inmate expenditures for publications; and by prohibiting Level I inmates from purchasing any publications. (2d PTO at 8-9.)  The court will address each claim individually, as well as consider their collective effect, in determining whether the right at issue was clearly established in the context of these cases.  In determining whether plaintiffs' rights were clearly established, the court must consider the state of the law at the time of the alleged violations.

Plaintiff Zimmerman alleges that defendants violated his rights by confiscating gift subscriptions mailed to him during the summer of 2000. (No. 00-3370, Doc. 1 at 4-5.)  Zimmerman filed his complaint on October 6, 2000.  Id.  Plaintiff Jacklovich claims that his publications were first confiscated in the summer of 1999; however, the bulk of the seizures to which he objects occurred in the summer of 2000.  (No. 01-3017, Doc. 1 at 3-5.)  Jacklovich filed his complaint on January 16, 2001.  Finally, plaintiff PLN alleges that various policy statements issued at Kansas prisons from as early as mid-1999 to as late as January 2002 violate its rights to send protected publications to inmates.  (Doc. 1 at 3-6.)  PLN fails to allege any specific times that the policies were actually enforced.

While the alleged violations occurred over a span of time rather

-20-

than at a discrete instant, the bulk of the violations occurred during the summer of 2000.  Furthermore, a survey of the case law shows that no opinions that would bear on the "clearly-established" inquiry were published during this time period.  Thus, fixing a precise date is not critical.   The court finds that the relevant time for determining whether plaintiffs' rights were clearly established is the middle of 2000.

    1.  Gift Publications

In order to meet their burden to show that their right to receive gift subscriptions to otherwise protected publications was clearly established in 2000, plaintiffs rely heavily on two cases from the Ninth Circuit: Sorrels v. McKee, 290 F.3d 965 (9th Cir. 2002) and Crofton v. Roe, 170 F.3d 957 (9th Cir. 1999).  Both cases dealt with Washington-state prison regulations, similar to those at issue here, that prohibited gift subscriptions and required that all publications be purchased through the prisoner's facility back account.  Sorrels, 290 F.3d at 967 & n.1; Crofton, 170 F.3d at 958-59.  Sorrels was decided too late to have any bearing on whether the law was clearly established in 2000; however, plaintiffs "[h]appily" rely on Sorrels for its observation that Crofton clearly established in the Ninth Circuit that a blanket ban on gift subscriptions violated prisoners' First Amendment right to receive information.  (Doc. 69 at 9.)

The court doubts that Crofton was as clear on the matter as Sorrels suggests; however, the Ninth Circuit is free to interpret its case law as it sees fit.  A closer reading of Crofton shows that it upheld an injunction against enforcement of the Washington regulations based on the defendants' failure to put forth any evidence showing

-21-

that the prisons had actually experienced the problems that the ban on gift subscriptions was purported to address. Crofton, 170 F.3d at 960. The ruling hardly stands for the proposition that such a ban is categorically unconstitutional. It was the defendants' burden to show that the rules had a legitimate penological purpose. Id. at 960-61. Since they failed to put forth any evidence, it is no wonder that they lost. Thus, the court finds that, while Crofton may represent the first crack in the dike regarding the legitimacy of bans on gift subscriptions for prisoners, it is not the watershed case that plaintiffs describe.

Crofton is the only relevant case from a federal appeals court that plaintiffs cite. Plaintiffs attempt to bolster the significance of Crofton by noting that the Tenth Circuit cited it in an unpublished case, Bloom v. Ruhnke, 42 Fed. Appx. 365, 367 (10th Cir. July 10, 2002). First, Bloom was not issued until well after all the present cases were filed. Furthermore, it dealt with the monthly spending limitation, not the ban on gift subscriptions. Finally, any endorsement of Crofton was substantially outweighed by the court's conclusion that "[d]efendants may well have a reasonable justification for limiting how much a prisoner can spend each month on reading materials." Bloom, 42 Fed. Appx. at 367. Bloom has no role in the qualified immunity calculus.

Next, plaintiffs rely on an unpublished stipulation in a case from the Middle District of Alabama. (Doc. 69 at 10.) Plaintiffs failed to include a copy of the case, as required by Local Rule 7.6(b). The court attempted to locate any decisions from that case, but was unsuccessful. Accordingly, the court rejects that case as

-22-

having any weight in this inquiry.  After all, when plaintiffs fail to produce the case or direct the court to a citation, it is plainly unreasonable to hold Kansas prison officials responsible for knowing of its existence.

Similarly, plaintiffs cite a case from a Kansas trial court as supporting their argument that the law regarding gift subscriptions was clearly established.  (Doc. 69 at 11.)  Contrary to Local Rule 7.6(b), they failed to attach a copy of the opinion, nor have they provided any evidence regarding the holding in that case.  The court was unable to find anything through its own research.  Thus, like the Alabama case, this state court case must be rejected.

In sum, plaintiffs have provided a single case from the Ninth Circuit in order to meet their burden to show that their right to receive gift subscriptions was clearly established at the time of the alleged violations here.  As the court noted, <u>supra</u>, the Ninth Circuit's opinion in <u>Crofton</u> is not as clear on the point as plaintiffs suggest.  As the Tenth Circuit has said, "[o]ne ambiguous bit of dictum in a Ninth Circuit opinion cannot form the basis for a 'clearly established' and 'particularized' duty." <u>Wilson</u>, 52 F.3d at 1555.  While the relevant statements from <u>Crofton</u> are probably not dictum, they are nonetheless ambiguous inasmuch as they lead one to question whether Washington's ban on gift subscriptions was struck down due to the defendants' failure to establish an evidentiary record to show that the ban had a legitimate penological purpose, rather than because, as a matter of law, there could be no justification for the ban.  In any event, the balance of the Tenth Circuit cases cited, <u>supra</u>, shows that a single case from another circuit will not suffice

-23-

to make a right clearly established, particularly where, as here, the underlying test of legality is intended to strike a balance between protecting the rights of prisoners and the needs of officials in running a penal institution.  Therefore, the court finds that a prisoner's right to receive gift subscriptions to otherwise protected publications (assuming there is such a right) was not clearly established at the time of the violations alleged in these cases.

2. $40 Monthly Limit and Ban on Level I Prisoners

Plaintiffs failed to address these rights in their brief.  Since plaintiffs are all represented by counsel, the court will not marshal evidence on their behalf, craft arguments, or perform their legal research for them.  See <u>Bad Ass Coffee Co. of Hawaii v. Bad Ass Coffee Ltd. Partnership</u>, 25 Fed. Appx. 738, 744 (10th Cir. Oct. 30, 2001) ("[Appellant's] citation of but one authority, and that of no pertinence, suggests either that there is no authority to sustain its position or that it expects the court to do its research") (quoting <u>Rapid Transit Lines, Inc., v. Wichita Developers, Inc.</u>, 435 F.2d 850, 852 (10th Cir. 1970); <u>Dimond v. J.C. Penney Co.</u>, 1997 WL 337509, *2 n.3 (10th Cir. June 19, 1997) (same).  Accordingly, they have failed to meet their burden to show that these rights were clearly established.[8]

In the alternative, the court notes that <u>Bloom</u>, though unpublished, certainly suggests that even as of 2002, the question of

---

[8] This rationale and conclusion also applies to any other claims for money damages remaining in the case.  Plaintiffs <u>only</u> addressed the law regarding gift subscriptions.  (Doc. 69.)  They have failed to meet their burden to show that the law was clearly established regarding any other claims for damages against these defendants.

-24-

whether a monthly spending cap on publications violated a prisoner's rights was still open in this circuit. <u>Bloom</u>, 42 Fed. Appx. at 367. As for the total ban on purchasing publications by Level I inmates, plaintiffs apparently cited some case law to Judge Van Bebber earlier in these proceedings:

> The court also notes Plaintiffs' reliance on <u>Spellman v. Hopper</u>, 95 F. Supp. 2d 1267 (M.D. Ala. 1999) for the proposition that the provision of IMPP 11-101 banning all subscriptions and publications to Level I inmates is unconstitutional. Plaintiffs' reliance on this case is misguided as, once again, it is distinguishable from the case at hand. In <u>Spellman</u>, the court declared unconstitutional an Alabama Department of Corrections regulation imposing an absolute prohibition on administrative segregation prisoners' receipt of subscription magazines and newspapers. 95 F. Supp. 2d at 1287. However, unlike the Level I classification for prisoners in Kansas, the <u>Spellman</u> court specifically noted that "[a]ssignment to administrative segregation is not a disciplinary measure." <u>Id.</u> at 1268. In fact, the <u>Spellman</u> court specifically implied that had the regulation been part of an incentive or disciplinary program, it would have been reasonably related to a legitimate penological interest. <u>Id.</u> at 1281-82. If Spellman supports any parties' position in this case, it supports Defendants' position, not Plaintiffs'.

<u>Zimmerman</u>, 260 F. Supp. 2d at 1084. The court reviewed <u>Spellman</u>, and agrees with Judge Van Bebber's assessment.

    3. Cumulative Effects

To the extent there may be some cumulative effect of the ban on gift subscriptions combined with the $40 monthly spending limit on publications for Level II and III prisoners, plaintiffs have failed to address it. More importantly, however, they have failed to cite any law that would suggest the right to be free from that or a similar combination of regulations was clearly established in 2000. The court

-25-

finds plaintiffs have failed to meet their burden on any such theory.

## V.   CONCLUSION

Plaintiffs have failed to meet their burden to show that any of the rights asserted in these cases were clearly established at the time of the alleged violations. All defendants are entitled to qualified immunity on all claims for damages. Summary judgment is therefore granted to all defendants as to all claims against them in their individual capacities.

Since the claims for declaratory and injunctive relief by plaintiffs Zimmerman and Jacklovich have been rendered moot by their parole, they have no claims remaining. Case No. 00-3370 and Case No. 01-3017 are accordingly dismissed. Case No. 02-4054 will continue toward disposition of the claims for declaratory and injunctive relief.

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp. The response to any motion for reconsideration shall not

-26-

exceed three pages.  No reply shall be filed.


        IT IS SO ORDERED.

        Dated this  21st   day of November 2005, at Wichita, Kansas.


                                    s/  Monti Belot
                                    Monti L. Belot
                                    UNITED STATES DISTRICT JUDGE